1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL D. HESS, | ) | 1:07-cv-00881 GSA |
| | ) | |
| | ) | |
| Plaintiff, | ) | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | (Documents 21) |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## BACKGROUND

Plaintiff Michael Hess ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") ceasing his eligibility for childhood disability benefits and denying his eligibility for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

///

///

///

---

[1]The parties consented to the jurisdiction of the United States Magistrate Judge. On February 12, 2008, the Honorable Oliver W. Wanger reassigned the case to the undersigned for all purposes.

1

## FACTS AND PRIOR PROCEEDINGS[2]

2

3

4

5

6

7

8

9

10

11

12

13

Plaintiff's mother filed an application on behalf of Plaintiff for childhood SSI on February 15, 1996.  AR 39, 99-111, 112-119.  The Commissioner initially found Plaintiff not disabled in May 1996, but revised the determination on June 17, 1998, and found Plaintiff disabled due to a learning disorder.  AR 39-40.  After Plaintiff reached the age of 18 on September 5, 2002, the Social Security Administration reevaluated Plaintiff's disability status and found that he was no longer disabled under the adult definition of disability as of January 2003.  AR 41, 51-54.  In March 2003, Plaintiff requested reconsideration of his disability cessation.  AR 69.  A disability officer held a hearing and denied benefits.  AR 61-72, 73-81. After being denied upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 82-84, 85.  On September 16, 2005, ALJ David Flierl held a hearing. AR 417-453.  ALJ Flierl denied benefits on November 3, 2005.  AR 16-26.  On April 20, 2007, the Appeals Council denied Plaintiff's request for review.  AR 6-9.

14

Hearing Testimony

15

16

17

On September 16, 2005, ALJ Flierl held a hearing in Bakersfield, California.  AR 417-453.  Plaintiff appeared and testified.  AR 419-434.  Plaintiff's mother, Debra Bates, and vocational expert, Kenneth Ferra, also appeared and testified.  AR 435-453.

18

19

20

21

22

23

24

25

26

At the outset of the hearing, the ALJ explained to Plaintiff that when a person who has received disability under the childhood standards reaches age 18, the person is re-evaluated because adult standards for disability are different.  AR 420.  The ALJ also notified Plaintiff that he could represent himself or that he could contact an attorney or other person to assist him.  AR 420-421.  The ALJ permitted the Plaintiff to talk with his mother about how to proceed.  AR 421. After a break, Plaintiff informed the ALJ that he would proceed by himself.  AR 422.  The ALJ then explained to Plaintiff that he would be evaluating Plaintiff's disabilities based on the adult standards, whether or not there is any work Plaintiff could perform in the national economy given his limitations, age, education, past work and medical treatment.  AR 422.  The ALJ also

27

28

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1   explained that the cessation date in Plaintiff's case was 1/1/03, and he was going to look at the

2   case at that time and not as to Plaintiff's condition at the time of the hearing.  AR 422.  The ALJ

3   advised that if Plaintiff thought his condition had worsened since January 2003, then Plaintiff

4   could file a new application.  AR 422.  The ALJ reiterated that he wanted Plaintiff to understand

5   that he was not determining Plaintiff's disability as of the date of the hearing.  AR 422.  The ALJ

6   also discussed the exhibits being admitted into evidence and the reason for the vocational

7   expert's presence at the hearing.  AR 423.  When the ALJ began to question Plaintiff, the ALJ

8   informed Plaintiff that if there was anything he did not understand at any time, then Plaintiff

9   should let the ALJ know and the ALJ would rephrase it.  AR 424-25.

10   Plaintiff testified that he was born on September 5, 1984.  AR 425.  He weighs about

11   240-250.  AR 425.  He is supposed to be 6'2", but because of the Sherman's disease he thinks he

12   is 5'10".  AR 425.  He probably weighed 180 in 2003.  AR 425.

13   Plaintiff had a back brace with him at the hearing.  AR 425.  He has had two, three or four

14   back braces.  AR 425.  He did not remember when he got the current one.  AR 426.

15   Plaintiff testified that he is left-handed.  AR 426.  He has an identification card, but does

16   not have a driver's license.  AR 426.  He receives Social Security benefits.  AR 426.  He does not

17   receive any other monies.  AR 426.  He has never worked or looked for work.  AR 426.  He

18   graduated from high school in special ed.  AR 426.  He can read the local newspaper, but usually

19   does not.  AR 426.  His mother gives him the Social Security papers and tells him where to sign.

20   AR 427.

21   Plaintiff testified that he was put on disability because of his back condition.  AR 427.  In

22   high school, he took a regular physical education class.  AR 427.  He tried to do all the activities

23   the other students did, but he could not do all of it.  AR 427.  In 2003, Plaintiff would have pains

24   in his back.  AR 428.  He would have the back brace on and start getting dizzy and having

25   headaches.  AR 428.  He could have cuts and bruises on his arms and legs from the back brace.

26   AR 428.  He was using the back brace 24/7 and his mom told him she would let him have it off

27   for two or three hours a day.  AR 428.  He has to get the back brace adjusted because he keeps

28   gaining weight.  AR 429.  He did not see the brace man every two weeks to adjust the brace.  AR

3

429.  It was too far out of the way.  AR 429.  It was a two hour trip to get to Dr. King and the "brace guy."  AR 429.  They could not keep going back and forth.  AR 429.  He does not still see Dr. King in L.A.  AR 429-430.

Plaintiff testified that he prepares his own meals.  AR 430.  He has had a checking account and pays some of the bills himself.  AR 430.  He took college computer classes in the previous year.  AR 430.  In high school, they let him take an extracurricular activity called ROP.  AR 431.  He and a couple of friends went up there and did a computer class.  AR 431.  He would work on the computer about an hour a day.  AR 431.

At about the time of the cessation, Plaintiff was living in Palmdale and was in his senior year of high school.  AR 431.  On a normal day, he would wake up in the morning, get dressed, take a shower, go to his class and do his homework when he got home.  AR 432.  He would help his mom out around the house--take the trash out or something--and then go to a friend's house and hang out for a couple of hours.  AR 432.  He would come back home, hang out with his parents for a couple hours and go to sleep.  AR 432.

In January 2003, he was not taking any kind of medication.  AR 432.  He probably took Tylenol for his back.  AR 432.  It was over-the-counter medication.  AR 432.  To his knowledge, Dr. King did not prescribe any medication for his back.  AR 432-433.

Plaintiff testified that he still had glasses.  AR 433.  His problem is distance vision, not reading.  AR 433.

Plaintiff further testified that he does a little of the laundry.  AR 433.  They live in a duplex and he tries to do yard work, like rake or put trash in the trash cans.  AR 433.  Sometimes his back will start hurting so he has to drop it.  AR 433-434.  He had a dishwashing job when he was nine or ten in a restaurant where his father worked.  AR 434.  He also had a job on a school program where they had to go to department stores and work for two days.  AR 434.  They had him hang clothes on a hanger and move little objects from place to place.  AR 434.

At the conclusion of questioning by the ALJ, Plaintiff also testified that there was nothing else that he wanted to tell the ALJ about his case that the ALJ had not asked.  AR 434.

1    Plaintiff's mother, Debra Bates, also testified in response to questions from the ALJ.  AR

2   435-436.  Prior to answering questions, Ms. Bates notified the ALJ that she had paperwork to

3   present on behalf of her son from Dr. King.  AR 435.  Ms. Bates explained that her son is on

4   Social Security and saw Dr. King through "Children Services."  AR 435.  He also has a back

5   brace through Children Services that no longer fits him now.  AR 435.  The "last one" she was

6   supposed to go to was cancelled out because he was considered an adult.  AR 435.  Dr. King

7   referred her to VIPA in Bakersfield because they do back braces.  AR 435.  It is an "electronical

8   back brace" that they shave down because it cuts and bruises Plaintiff.  AR 435.

9    After Ms. Bates was sworn in to testify, the ALJ indicated that Ms. Bates had called the

10  previous day and wanted to know what was going on.  AR 436.  The ALJ reminded Ms. Bates

11  that there was a hearing before a hearing officer about a year prior.  AR 436.  The ALJ explained

12  to Ms. Bates that once her son turned 18, the law required that the case be re-evaluated under the

13  adult disability standards.  AR 436.  The previous hearing officer determined that her son was not

14  entitled to benefits as of 1/1/03.  AR 436.  She appealed the decision that her son was able to

15  work, which was why she was at the hearing.  AR 436-437.  The ALJ indicated that a written

16  decision was sent to her.  AR 437.  Ms. Bates reported that she did not get the decision and the

17  only thing she got in the mail reinstated her son's benefits as an adult.  AR 437.  The ALJ

18  explained that she must have signed a document requesting that benefits continue pending the

19  appeal.  AR 437.  Ms. Bates responded that she understood what the ALJ was saying and the

20  reason they were going to continue benefits was because she wanted to appeal.  AR 437.  Ms.

21  Bates indicated that she did not have her son's medical background paperwork to give to the

22  Social Security officer at that time to prove her son has Sherman's diseases, conosis and

23  scoliosis.  AR 437.

24    The ALJ further explained to Ms. Bates that in a normal disability case you look at the

25  disability up to the present time, but not in this case.  AR 437.  In this case, he is looking at

26  Plaintiff's condition as of 1/1/03, the cessation date.  AR 437-438.  The ALJ notified Ms. Bates

27  that if there has been a substantial change in Plaintiff's condition since 1/1/03, then she should

28  file a new application for disability under the adult standards.  AR 438.  Ms. Bates indicated that

1   the reason the ALJ did not have anything up to date on Plaintiff is because he does not qualify

2   under children's services and has to go under somebody else in Bakersfield.  AR 438.  The ALJ

3   reiterated his point that he is looking at this case as of 1/1/03.  AR 439.  The ALJ then took

4   records from Ms. Bates dated 1998, 1999, 2001 and 2002.  AR 439.

5        During questioning, the ALJ informed Ms. Bates that the biggest problem her son had in

6   the case was with complying with what Dr. King told him to do about wearing the brace.  AR

7   441.  Ms. Bates testified that Plaintiff got his back brace from CCS "through Children's Services

8   through Opine Motion through Dr. King's office."  AR 441.  Dr. King is the one who referred

9   him out to children's services because her son was a child at that time.  AR 441.  They cared for

10  him until he was 18 years old.  AR 441.  Dr. King did not know that the back brace was cutting

11  and bruising Plaintiff, which is why Plaintiff was sent to Opine Motion and CCS to shave it

12  down and correct him.  AR 441.  Plaintiff has to wear gauze underneath the brace.  AR 441.  Ms.

13  Bates did not think he got a new brace, but that they attached another belt or something because

14  the pole was choking him.  AR 442.

15       Ms. Bates testified that Plaintiff's back brace was adjusted several times because he's

16  been gaining weight.  AR 442.  There was no schedule that the doctor had.  AR 442.  It was

17  through CCS and Opine Motion, not Dr. King.  AR 442.  Dr. King tested her son's back and told

18  her that it was getting "worse and worse."  AR 442.  Dr. King said Plaintiff should see the "brace

19  man" every two weeks to adjust the brace.  AR 443.  Ms. Bates and her son would go to CCS

20  Children's Service and Opine Motion.  AR 443.  They noticed the brace was scratching and

21  cutting Plaintiff because it would gouge his skin.  AR 443.  She did not think Plaintiff ever had a

22  new back brace.  AR 443.  Plaintiff did tell them that it was hurting him and it was too small, so

23  they adjusted it.  AR 442.

24       Ms. Bates testified that her son has increased in weight and Dr. King told him to go on a

25  diet.  AR 443A.  In the meantime, they adjusted it again.  AR 443A.  It does not fit Plaintiff's

26  back anymore.  AR 443A.  He has gained wight.  AR 443A.  When he was supposed to go back

27  again in September 2004, CCS would no longer see her son because he "turned an adult."  AR

28  443A.

1    Ms. Bates testified that she and her son left L.A. in June 2004. AR 444. She was pretty

2    sure that Plaintiff had seen Dr. King between November 2002 and November 2003. AR 444.

3    Opine Motion told them her son could no longer see Dr. King at the age of 18. AR 445. Plaintiff

4    turned 18 in September of 2002. AR 445. Ms. Bates testified that an MRI was not done because

5    MediCal will not cover it. AR 445.

6    Ms. Bates also testified that Plaintiff graduated from high school in 2003. AR 447. He

7    has a learning disability. AR 447. They tested him and they thought there was something wrong

8    with his ears. AR 447. He has 80 percent scarring in his right ear. AR 447. He has had tubes

9    done four times. AR 447. He is 21, but acts like he is 15 half of the time. AR 447. He has

10    glasses, but does not wear them all the time because they give him headaches and need to be

11    adjusted. AR 448.

12    Ms. Bates also testified that Plaintiff is angry because he wants to work, but knows he

13    cannot because it hurts his back. AR 448. He always has back pains. AR 448. It bothers his

14    lower back to lift out the trash. AR 448. He has been taking over-the-counter Tylenol and

15    ibuprofen for his back. AR 448. Dr. King just told him to take Tylenol. AR 449. Dr. King said

16    there was nothing he could prescribe for Plaintiff and suggested physical therapy, exercises,

17    Tylenol and wearing the back brace. AR 449.

18    At the conclusion of questioning, the ALJ asked Ms. Bates if there was anything else she

19    wanted to tell him about the case that he had not asked but that she thought he should know. AR

20    449. Ms. Bates responded "just that it's still going on. That he is seeing doctors for his back.

21    And to see if we can get the back brace fixed again." AR 449.

22    The ALJ brought Plaintiff into the room to finish the hearing. AR 450. He allowed Ms.

23    Bates to remain in the room during questioning of the vocational expert. AR 450. The ALJ then

24    questioned vocational expert, Kenneth Ferra. AR 450. For the first hypothetical, the ALJ asked

25    the VE to assume a person of 18 years of age at the cessation date, a high school education in

26    "special ed" and no prior work history. AR 450. The ALJ also asked the VE to assume the

27    person would be limited to the light level of exertion, simple, repetitive work and occasional

28    stooping, bending and crouching. AR 450. The VE testified there would be some assembly

7

positions in the national economy compatible with the hypothetical, with approximately 4,500 of those jobs in California.  AR 450.  At this point in the questioning, Ms. Bates indicated that she did not understand what they were talking about.  AR 450.   The ALJ explained that he was asking for jobs at the light level of exertion, of a simple repetitive nature, with only occasional stooping, bending or crouching.  AR 450.

The ALJ resumed questioning of the VE.  AR 450.  He inquired whether the jobs included both sedentary and light.  AR 450.  The VE testified that it would be light.  AR 451. The ALJ then asked the VE to further assume that because of the physical condition, the person would be likely to miss work on an unscheduled basis two to three times a month.  AR 451.  The VE testified that there would no jobs.  AR 451.

After the vocational expert testified, Ms. Bates asked the ALJ what job was going hire her son with his limitations.  AR 451.  The ALJ indicated that the first question was determining Plaintiff's physical condition (what he can do), but that he did not have control over hiring.  AR 451.

At the conclusion of the hearing, the ALJ indicated that he did not see any need to hold the record open and that he would make his decision based on the evidence presented at the hearing, the evidence in the file and the documents brought to the hearing.  AR 452.  The ALJ notified Plaintiff and his mother that a written decision would be sent in the mail in about two months.  AR 452.  Ms. Bates asked whether she could appeal again.  AR 452.  The ALJ informed her that although she could appeal, a denial by the ALJ would end Plaintiff's benefits.  AR 453.

 Medical Evidence

On September 12, 1991, Sherman L. Thomas, Ph.D., completed a psychological-educational evaluation of Plaintiff in the first grade for possible special education eligibility.  AR 220-21.  Dr. Thomas reported that Plaintiff showed mentally deficient/borderline ability in the verbal cognitive area and mentally deficient/low average ability in the nonverbal cognitive area. AR 221.  Dr. Thomas opined that Plaintiff's most significant learning handicap appeared to be in spatial relationships, perceptual organization and verbal comprehension.  AR 221.  Dr. Thomas further opined that while Plaintiff showed significant problems in the identified areas, he also

appeared to be able to learn.  AR 221.  Dr. Thomas concluded that Plaintiff did not appear

eligible for special education.  AR 221.

On January 17, 1996, Plaintiff sought emergency room treatment for leg pain and

possible behavioral problems.  AR 192-93.  Plaintiff's mother was directed to schedule an

appointment with Desert Counseling for an ADD evaluation of Plaintiff.  AR 193.

On February 20, 1996, Dr. Thomas completed a psychological-educational evaluation of

Plaintiff.  AR 211-12.  Dr. Thomas reported that Plaintiff showed mentally deficient/low average

ability in the verbal cognitive area and mentally deficient/borderline ability in the nonverbal

cognitive area.  AR 212.  Dr. Thomas concluded that Plaintiff's most significant learning

handicaps appeared to be in perceptual organization, spatial relationships and, to a lesser degree,

conceptual thinking (visual and audio processing).  AR 212.  Plaintiff also showed strength in the

area of visual logical abstract thinking and freedom from distractability.  AR 212.  Dr. Thomas

opined that Plaintiff was eligible for special education program consideration, such as a Special

Day Class program or RSP.  AR 212.

On March 7, 1996, Kimball Hawkins, Ph.D., completed a psychological evaluation of

Plaintiff on behalf of Kern Regional Center to determine Plaintiff's level of intellectual and

adaptive functioning.  AR 227-30.  Testing revealed scores within the low average range in

intellectual and adaptive functioning.  AR 228.  Dr. Hawkins concluded that Plaintiff had a

discrepancy between his intellectual ability and his achievement and may need a Resource

Specialist Program.  AR 230.  Dr. Hawkins recommended that Plaintiff was not eligible for Kern

Regional Center services because he did not have mental retardation or any other developmental

disability.  AR 230.  Dr. Hawkins further recommended consideration of Resource Specialist

Program classes due to deficits in academic achievement and family therapy because of reports of

significant conflict and behavioral acting out.  AR 230.

On March 7, 1996, Arnold Chun, M.D., M.P.H., completed a medical evaluation of

Plaintiff on behalf of Kern Regional Center.  AR 231-34.  On physical and neurological

examination, Plaintiff had some scarring over the right tympanic membrane, a slightly distorted

left tympanic membrane and caries.  AR 233.  The remainder of his examination was otherwise

unremarkable.  AR 233.  Dr. Chun reported that Plaintiff had a history of recent concept of change in behavior within the past 2 ½ years, possible subnormal intellectual functioning, history of persons with either learning problems or subnormal intellectual functioning in the maternal family, history of frequent ear infections and right-sided hearing loss with subsequent placement of two sets of PE tubes and a benign bone cyst of the left tibia with subsequent bone graft procedure.  AR 233.  Dr. Chun opined that Plaintiff was not medically eligible for regional center services because he had no evidence of cerebral palsy, epilepsy or autism.  AR 233.  Dr. Chun recommended that Plaintiff be referred for counseling services.  AR 234.

On March 20, 1996, Plaintiff was found not eligible for special education services because he did not have a significant discrepancy between ability and achievement.  AR 218-19. The resource specialist teacher prepared a letter indicating that Plaintiff had been on a completely modified program during fifth grade and his teachers were concerned about his academic and emotional survival in junior high.  AR 222.  The teacher reported that Plaintiff's mother was requesting placement in a Special Day Class.  AR 222.

On March 25, 1996, Plaintiff's mother requested that Plaintiff be evaluated for placement in a Special Day Class.  AR 257.

On April 16, 1996, Plaintiff's fifth grade teacher, C. Gregory, completed a Teacher's Questionnaire form.  AR 214-17.  Ms. Gregory opined that Plaintiff had severe problems finishing things he starts, organizing work, and learning new skills and keeping up with peers. AR 214.  He had marked problems concentrating on school work and thinking before acting.  AR 214.  He also had moderate problems listening, remaining attentive and acknowledging his own mistakes.  AR 214.  Ms. Gregory reported that Plaintiff's writing skills were poor, he struggled with fine motor skills and he did not appear able to care for his own personal needs, wetting himself 3 to 4 times during the year.  AR 216-17.

On April 29, 1996, Kern Regional Center prepared an assessment/closing summary report regarding Plaintiff.  AR 225-26.  Kern Regional Center determined that Plaintiff did not present with a diagnosis of mental retardation or any medical diagnosis qualifying him for regional center services.  AR 225.  Kern Regional Center recommended that Plaintiff and his family

1  become involved in counseling services.  AR 226.  Plaintiff's mother reported that she was

2  unable to pay for such services.  AR 226.

3       On May 22, 1996, the Kern County Consortium for Special Education developed an

4  Individualized Education Program ("IEP") for Plaintiff.  AR 245-54.  The IEP team

5  recommended that Plaintiff be placed in a special day class beginning in August 1996.  AR 245.

6  Based on testing, the IEP team concluded that Plaintiff had a severe discrepancy between ability

7  and achievement as a result of a disorder in visual processing.  AR 247.

8       In May 1996, Aida Berlese, M.D., a state agency medical consultant, completed a Case

9  Summary and Rationale for Child from Age 3 to Attainment of Age 16 form.  AR 235-37.  Dr.

10  Berlese opined that Plaintiff had a moderate to mild impairment of cognitive development, a

11  mild impairment of motor development, a mild impairment of social development and a mild

12  impairment of concentration, persistence and pace.  AR 235-36.  Dr. Berlese concluded that

13  Plaintiff's impairment did not substantially reduce his ability to function independently,

14  appropriately and effectively in an age appropriate manner.  AR 237.

15       On May 11, 1998, Plaintiff's IEP was amended to change his placement from RSP to

16  SDC.  AR 241-42.  The IEP team explained that Plaintiff had been exhibiting social and

17  academic difficulties that suggested a special class placement would be more appropriate.  AR

18  242.

19       On May 14, 1998, D.V. Pillai, M.D., of Sierra Psychiatric Services, conducted an initial

20  psychiatric evaluation of Plaintiff.  AR 243-44.  On mental status examination, Dr. Pillai reported

21  that Plaintiff was easily distracted, had a learning disability, had a low attention span, had violent

22  outbursts, was self-mutilating and mean to pets and had very poor social sense.  AR 244.  Dr.

23  Pillai diagnosed Plaintiff with oppositional defiant disorder and encopresis.  AR 244.  Dr. Pillai

24  recommended psychological testing at school, consideration of antidepressants and mood

25  stabilizers and family counseling.  AR 240, 244.

26       On June 17, 1998, state agency medical consultant Edwin Wiens, M.D., completed a

27  Childhood Disability Evaluation Form.  AR 266-69.  Dr. Wiens opined that Plaintiff medically

28

1   equaled a listing and there was sufficient information in the file for a favorable reopening with an

2   onset date of February 1996.  AR 266, 269.

3          On March 1, 2002, Kevin Van Laeken, a school psychologist in the Antelope Valley

4   Union High School District, completed a psycho-educational assessment of Plaintiff.  AR 270-

5   74.  In a review of Plaintiff's academic behavior, the school psychologist noted that Plaintiff had

6   completed 130 of 150 credits attempted and had passed three of the four required semesters of

7   physical education without any modifications.  AR 271.  Following testing, the school

8   psychologist concluded that Plaintiff did not exhibit a severe ability/achievement discrepancy

9   between an estimated borderline intellectual ability and any academic area.  AR 272.  However,

10  Plaintiff had a disorder of visual and auditory processing that required special education services.

11  AR 272.  The school psychologist also concluded that while Plaintiff may have had orthopedic

12  impairments, they were not of sufficient severity to adversely impact Plaintiff's educational

13  performance or require specialized instruction.  AR 272.

14         On April 17, 2002, Plaintiff saw Dr. King, of Spine, Pediatric Orthopaedic and Trauma

15  Surgeons, for follow-up on his back.  AR 277.  Dr. King reported that he had not seen Plaintiff

16  since September 2001.  AR 277.  In 2001, Plaintiff had a 65-degree kyphosis and they ordered a

17  new back brace.  AR 277.  Dr. King indicated that Plaintiff only wore the brace two hours a day.

18  AR 277.  On examination, Plaintiff had grown 2 5/8" in seven months and had gained 19 pounds.

19  AR 277.  X-rays revealed that Plaintiff's kyphosis was 38 degrees in the brace.  AR 277.  Dr.

20  King recommended that Plaintiff wear the brace full time, 22 hours a day, seven days a week and

21  see a physical therapist.  AR 277.

22         On June 19, 2002, Plaintiff again saw Dr. King.  AR 276.  Dr. King reported that Plaintiff

23  was wearing his brace for one hour a day.  AR 276.  X-rays showed that Plaintiff's kyphosis had

24  "jumped back up" to 46 degrees and his swayback was 50 degrees.  AR 276.  Dr. King indicated

25  that Plaintiff needed to wear his brace 22 hours a day, seven days a week, must do his exercises,

26  and should see the brace man every two weeks.  AR 276.  Dr. King opined that Plaintiff was "not

27  with the program at all."  AR 276.

28

On August 1, 2002, Plaintiff saw Dr. King for follow-up treatment of his kyphosis.  AR 275.  Dr. King reported that Plaintiff was not wearing his brace for more than three or four hours a day.  AR 275.  X-rays revealed that Plaintiff's kyphosis was 47 degrees and his swayback was 48 degrees.  AR 275.  Dr. King also reported having a long talk with Plaintiff about wearing the brace full time if he wanted correction.  AR 275.

On November 4, 2002, Plaintiff saw Dr. King for follow-up.  AR 280.  Dr. King reported that Plaintiff's kyphosis was 33 degrees and his swayback was 46 degrees.  AR 280.  Dr. King noted that Plaintiff's brace was broken and had to be adjusted.  AR 280.  Dr. King opined that Plaintiff should wear the brace 22 hours a day, 7 days a week and needed to do exercises.  AR 280.

On November 20, 2002, Plaintiff's special day class teacher completed a Community Outreach Questionnaire.  AR 164-65.  The teacher opined that Plaintiff took good care of himself, did not exhibit any unusual behavior, mannerisms, fears or posturing, did not need assistance keeping appointments, had no indications of memory loss or problems with concentration or focusing, was cooperative, arrived on time, was accepted by his peers and was able to understand and carry out simple verbal and written instructions.  AR 164-65.

On December 3, 2002, Dan Matzke, Ph.D., a licensed psychologist, completed a psychological evaluation of Plaintiff.  AR 281-85.  On mental status examination, Plaintiff's mood and affect were generally appropriate.  He was alert and oriented and had no evident disturbances of thought process or content.  He also had good concentration and attention, unimpaired judgment and fair insight.  AR 282-83.  On the Folstein Mini-Mental State Test, Plaintiff had a score of 29, which was not indicative of severe cognitive/intellectual impairment or dysfunction.  AR 283.  With regard to functioning, Plaintiff reported that he did some occasional food shopping and some cooking.  AR 283.  He also did his own laundry, handled money and had a checking account.  AR 283.  Dr. Matzke reported that Plaintiff's intellectual/cognitive abilities were estimated to be in the "Low Average" range.  AR 283.  The clinical interview and mental status exam "did not reveal any serious cognitive, emotional or behavioral dysfunction."  AR 283.  Dr. Matzke diagnosed Plaintiff with a learning disorder NOS

and assigned him a Global Assessment of Functioning ("GAF") of 55-60.  AR 284.  Dr. Matzke

opined that Plaintiff had a fair ability to understand, remember and carry out complex job

instructions and a fair ability to respond appropriately to work situations/requirements.  AR 285.

Plaintiff's ability to function in these areas was markedly limited, but not precluded by learning

disorders.  AR 284-85.

On December 30, 2002, Dr. King completed a Report of Contact form.  AR 286.  Dr.

King opined that Plaintiff should be able to perform light work activity, which entailed

standing/walking of 6 hours per day, lifting/carrying of 10 pounds frequently and 20 pounds

occasionally, and occasional stooping.  AR 286.

On December 31, 2002, Anne M. Khong, M.D., a state agency medical consultant,

completed a Physical Residual Functional Capacity Assessment form.  AR 287-94.  Dr. Khong

opined that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently, could

stand and/or walk about 6 hours in an 8-hour workday, could sit about 6 hours in an 8-hour

workday and could push and/or pull without limitation.  AR 289.  He occasionally could climb,

balance, stoop, kneel, crouch and crawl.  AR 289.  He did not have manipulative, visual,

communicative or environmental limitations.  AR 290-91.

On January 10, 2003, Luyen T. Luu, M.D., a state agency psychiatrist, completed a

Mental Residual Functional Capacity Assessment form.  AR 295-301.  Dr. Luu opined that

Plaintiff was not significantly limited in understanding and memory, sustained concentration and

persistence, social interaction and adaptation.  AR 295-96.  Dr. Luu further opined that Plaintiff

had sufficient ability to understand and remember simple and detailed instructions and sufficient

ability to carry out short and detailed instructions that did not involve reading, math or writing.

AR 297.

On January 10, 2003, Dr. Luu also completed a Psychiatric Review Technique form.  AR

302-13.  Dr. Luu opined that Plaintiff's learning disorder NOS was a medically determinable

impairment that did not precisely satisfy the diagnostic criteria of an organic mental disorder.

AR 303.  Dr. Luu further opined that Plaintiff had mild restriction of his activities of daily living,

mild difficulties in maintaining social functioning and mild difficulties in maintaining

concentration, persistence or pace.  AR 312.

On January 28, 2003, Plaintiff and his mother consented to a special education IEP dated

May 8, 2002.  AR 314-44.  The Antelope Valley Special Education Local Plan Area ("Antelope

Valley SELPA") recommended that Plaintiff be placed in a Special Day Class for four periods

per day.  AR 315.

On May 12, 2003, Plaintiff's teacher completed a Teacher Questionnaire form.  AR 359-

66.  The teacher reported that Plaintiff had between 36-40 verified illness absences during the

twelfth grade.  AR 359.  On the form, Plaintiff's teacher indicated that Plaintiff did not have any

problems acquiring and using information.  AR 360.  He only had slight problems in

comprehending oral instructions, understanding school and content vocabulary, reading and

comprehending written material, comprehending and doing math problems, expressing ideas in

written form, learning new material and recalling and applying previously learned material.  AR

360.  Plaintiff's teacher opined that Plaintiff had no problem interacting and relating with others

and no problem moving about and manipulating objects.  AR 362-63.  He had slight problems

with taking care of his personal hygiene and using good judgment regarding personal safety and

dangerous circumstances.  AR 364.  Plaintiff's teacher also reported that Plaintiff used glasses

and frequently missed school due to illness.  AR 365.

On June 9, 2003, Plaintiff's special day class teacher completed a Teacher Questionnaire

form.  AR 367-74.  She reported that Plaintiff had problems acquiring and using information.

AR 368.  He had a serious problem comprehending oral instructions, understanding school and

content vocabulary, reading and comprehending written material, comprehending and doing math

problems, understanding and participating in class discussions, providing organized oral

explanations and adequate descriptions, expressing ideas in written form, learning new material

and applying problem-solving skills in class discussions.  AR 368.  He had a very serious

problem recalling and applying previously learned material.  AR 368.  Plaintiff's teacher also

reported that Plaintiff had problems attending and completing tasks.  AR 369.  He had an obvious

problem, on a daily basis, with paying attention when spoken to directly, sustaining attention

during play/sports activities, focusing long enough to finish assigned activity or task, refocusing to task when necessary, carrying out multi-step instructions and organizing his own things or school materials.  AR 369.  He also had a serious problem expressing anger appropriately.  AR 370.

Plaintiff's teacher opined that Plaintiff had a very serious problem moving and manipulating things (e.g., pushing, pulling, lifting, carrying, transferring objects, coordinating eyes and hands to manipulate small objects.  AR 371.  The teacher noted that, due to illness, Plaintiff had a hard time lifting.  AR 371.  She further indicated that Plaintiff was not supposed to be lifting or bending to lift and he should have been wearing a back brace.  AR 371.  Plaintiff's teacher further reported that Plaintiff had problems caring for himself.  AR 372.  He had a serious problem taking care of personal hygiene on a daily basis.  AR 372.  He also had an obvious problems using good judgment regarding personal safety and dangerous circumstances, identifying and appropriately asserting emotional needs, responding appropriately to changes in own mood (e.g., calming self) and using appropriate coping skills to meet the daily demands of the school environment.  AR 372.

On June 9, 2003, Dr. Matzke completed a consultative psychological evaluation of Plaintiff.  AR 375-81.  On mental status exam, Plaintiff's mood and affect were appropriate.  AR 377.  He was alert and oriented and his memory appeared unimpaired.  AR 377.  He had no evident disturbances of thought process or content.  AR 377.  His concentration and attention were fair-to-good (mild deficits) and he had some (mild-to-moderate) impulsive tendencies.  AR 377.  His intellectual functioning appeared to be in the "Average" classification range.  AR 377.  On the Bender Visual Motor Gestalt Test, Plaintiff had mild-to-moderate deficits in visual-motor/perceptual skills and some indicators of impulsiveness.  AR 377.  On the Wechsler Adult Intelligence Scale-Third Edition, Plaintiff had a full scale IQ of 90.  AR 378.  The results indicated that Plaintiff's verbal abilities were in the "Average" range, his performance abilities were in the "Low Average" range, and his overall intellectual/cognitive abilities were measured in the "Average" classification range.  AR 378.  Dr. Matzke noted that Plaintiff made several errors on the subtests due to impulsiveness and inattention.  AR 378.  The results of the Wechsler

Memory Scale-Third Edition indicated that Plaintiff's short term and long term memory were in the average range. AR 378. Dr. Matzke opined that Plaintiff had no severe cognitive, emotional or behavioral dysfunction and diagnosed Plaintiff with a Learning Disorder NOS by history. AR 380. He assigned Plaintiff a GAF of 55-60. Dr. Matzke further opined that Plaintiff had a fair ability to understand, remember and carry out complex job instructions and a fair ability to respond appropriately to work situations/requirements. AR 381.

A Physical Residual Functional Capacity Assessment form indicated that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday and could push and/or pull without limitation except as shown for lift and/or carry. AR 383. He could never climb a ladder, rope or scaffolds. AR 384. He occasionally could stoop and crouch. AR 384. He had no manipulative, visual, communicative or environmental limitations. AR 387-86.

On June 18, 2003, Keith M. Quint, M.D., a state agency medical consultant, completed a Mental Residual Functional Capacity Assessment form. AR 390-93. Dr. Quint opined that Plaintiff had moderate limitations in the ability to understand and remember detailed instructions and moderate limitations in the ability to carry out detailed instructions. AR 390. Plaintiff could understand and remember adequately to perform simple routine and repetitive tasks -nothing complex, could sustain concentration and persistence for 2-hour intervals, could adequately interact with public, peers and supervisors in basic work situations and could adapt to normal work environment situations at SRT level. AR 392. On June 20, 2003, state agency psychiatrist, Harvey Biala, M.D., also signed the form. AR 392.

On June 20, 2003, Dr. Biala also completed a Psychiatric Review Technique form. AR 394-402. Dr. Biala opined that Plaintiff had a learning disorder NOS, which was a medically determinable impairment that did not precisely satisfy the diagnostic criteria of an organic mental disorder. AR 395. Dr. Biala further opined that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace. AR 400.

On November 11, 2003, Dr. King prepared a Statement of Medical Necessity indicating that Plaintiff needed an MRI of his lumbar spine for disc prominences. AR 407. On that same

1  date, Dr. King prepared a prescription addressed to physical therapy indicating that Plaintiff had

2  Scheuermann's kyphosis with swayback.  AR 408.  Dr. King indicated that the swayback was

3  causing low back pain and Plaintiff needed "P.T. ie pelvic tilt; abdom. ex, etc."  AR 408.

4  Dr. King also prepared a prescription addressed to S.S.I., stating "Continue Benefits because he

5  can't work temporarily."  AR 409.

6  _____ALJ's Findings

7  　　　The ALJ determined that Plaintiff had not engaged in substantial gainful activity since the

8  disability onset date.  AR 20, 25.  The ALJ found that Plaintiff had severe impairments of

9  back/spine problem and learning disorder not otherwise specified, but he did not have an

10  impairment or combination of impairments that met or medically equaled one of the listed

11  impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 25.  The ALJ further found that

12  Plaintiff had the residual functional capacity for light work activity with occasional stooping,

13  bending, crouching and crawling.  AR 25.  Using the Medical-Vocational Rules as a framework,

14  the ALJ determined there were a significant number of jobs in the national economy that Plaintiff

15  could perform.  AR 25.  Therefore, the ALJ concluded that, as of January 1, 2003, the severity of

16  claimant's impairments did not meet the adult disability standards and his eligibility for

17  childhood disability benefits properly was ceased.  AR 25-26.

18  **SCOPE OF REVIEW**

19  　　　Congress has provided a limited scope of judicial review of the Commissioner's decision

20  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

21  the Court must determine whether the decision of the Commissioner is supported by substantial

22  evidence.  42 U.S.C. § 405(g).  Substantial evidence means more than a mere scintilla,

23  *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance.  *Sorenson v.*

24  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

25  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401

26  (internal quotation marks and citation omitted).  The record as a whole must be considered,

27  weighing both the evidence that supports and the evidence that detracts from the Commissioner's

28  conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and

making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the correct legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 416.920 (a)-(g) (2005).  Applying the evaluation process in this case, the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since the alleged onset of disability; (2) has an impairment or a combination of impairments that is considered "severe" (back/spine problem and learning disorder not otherwise specified) based on the requirements in the Regulations (20 C.F.R. § 416.920(c) (2005)); (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in Appendix 1 to Subpart P of Part 404; (4) does not have past relevant work; but (5) can perform jobs that exist in significant numbers in the national economy.  AR 25.  The ALJ concluded that as of January 1, 2003, the severity of Plaintiff's impairments did not meet the adult disability standards.

1    Plaintiff argues that the ALJ erred by failing to provide a fair hearing and by failing to

2    develop the record.  Plaintiff also argues that the ALJ's findings regarding the severity of

3    Plaintiff's mental impairment were not supported by substantial evidence.

4                                    **DISCUSSION**

5    A.    The ALJ Provided Plaintiff With A Fair Hearing.

6           Plaintiff contends that the ALJ erred by allowing Plaintiff to waive his right to counsel

7    and by "allowing Plaintiff to proceed without the aid of any representative in light of his mental

8    condition."  Plaintiff's Opening Brief, at p. 7.  As an initial matter, there is no requirement that

9    Plaintiff be represented by counsel.  *See, e.g.*, *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978).

10   Further, the "[l]ack of counsel does not affect the validity of the hearing unless the plaintiff can

11   demonstrate prejudice or unfairness in the administrative proceedings."  *Key v. Heckler*, 754 F.2d

12   1545, 1551 (9th Cir. 1985); *Vidal v. Harris*, 637 F.2d 710, 713 (9th Cir. 1981).  In this instance,

13   the ALJ fully advised Plaintiff of his right to counsel and allowed Plaintiff to consult with his

14   mother regarding legal counsel before proceeding with the hearing.  AR 420-22.  There is no

15   indication in the record that Plaintiff did not understand his right to be represented at the hearing.

16   Accordingly, the issue is whether the hearing was fair and the record fully developed, not

17   whether Plaintiff properly waived his right to counsel.

18        *Duty to Develop the Record*

19          Where a claimant is unrepresented, the Ninth Circuit has long recognized that the ALJ

20   has an independent duty to fully develop the record.  *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th

21   Cir. 1992).  It is "incumbent upon the ALJ 'to scrupulously and conscientiously probe into,

22   inquire of, and explore for all the relevant facts.'  He must be 'especially diligent in ensuring that

23   favorable as well as unfavorable facts and circumstances are elicited.'"  *Cox*, 587 F.2d at 991

24   (citations omitted).

25          In contending that the ALJ inadequately developed the record, Plaintiff argues that the

26   ALJ failed to elicit testimony regarding Plaintiff's mental impairment.  Plaintiff's Opening Brief,

27   at p. 7.  This argument is without merit.  The ALJ met his burden to explore all relevant facts

28   regarding Plaintiff's mental impairment by questioning both Plaintiff and his mother regarding

1  Plaintiff's condition and daily activities.  In this regard, Plaintiff testified that he took special

2  education classes and graduated from high school.  AR 426.  Plaintiff also described a regular

3  day during the relevant time period as going to classes, doing homework, helping his mother at

4  home and hanging out with family and friends.  AR 432.  Plaintiff further testified that he could

5  read the newspaper, prepare his own meals, handle his own checking account and pay some of

6  his own bills. AR 426, 430.  He also took some computer classes and participated in a

7  department store job through a school program.  AR 434.  In addition, Plaintiff's mother testified

8  that Plaintiff had a learning disability, but was able to graduate from high school.  AR 447.  This

9  testimony, elicited at the hearing, was relevant to Plaintiff's mental impairment.  The ALJ also

10  permitted Plaintiff and his mother to offer any additional information that the ALJ had not

11  inquired about.  AR 434, 449.  Plaintiff did not offer any information regarding a mental

12  impairment while Plaintiff's mother offered information only with regard to Plaintiff's back and

13  back brace.  *Id.*  Further, neither Plaintiff nor his mother contended that Plaintiff's disabling

14  condition was due to a mental impairment.  Plaintiff himself asserted that he was on disability

15  solely because of problems with his back.  AR 427.  Plaintiff's mother likewise testified that

16  Plaintiff was angry he could not work due to back pain.  AR 427.

17       Plaintiff's additional contention that the ALJ erred by failing to have a medical advisor at

18  the hearing to testify regarding Plaintiff's mental impairment is also without merit.  Generally,

19  ALJs have a duty fully and fairly to develop the record when the evidence is ambiguous or "the

20  record is inadequate" to allow for proper evaluation of the evidence.  *See*, *e.g.*, *Tonapetyan v.*

21  *Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  Here, the ALJ obtained and considered treatment

22  records and evaluations regarding Plaintiff's mental impairment from school evaluators,

23  including school psychologists and teachers, and from the consultative psychological examiner.

24  AR 20-22.  There is no indication that this record was inadequate or ambiguous to preclude

25  proper evaluation of Plaintiff's mental impairment.  Therefore, the absence of a medical advisor

26  at the hearing was not error.

27       Insofar as Plaintiff contends that the hearing was not fair because Plaintiff and his mother

28  were confused during the hearing, the record reflects that the ALJ spent time explaining to

Plaintiff and his mother the purpose of the hearing and the issues to be determined, describing

the procedures, and answering any questions raised by Plaintiff or his mother.  The ALJ also

informed Plaintiff that if there was anything he did not understand at any time, then he should let

the ALJ know.  AR 424-25.  There is no indication that Plaintiff and his mother did not

understand the proceedings or any explanations of such proceedings provided by the ALJ.

     Based on the foregoing, the court finds no prejudice or unfairness in the administrative

proceeding.

B.    <u>The ALJ's Determination Regarding Plaintiff's Mental Impairment is Supported by Substantial Evidence</u>.

     Plaintiff contends that the ALJ's assessment of Plaintiff's mental impairment is not

supported by substantial evidence.

    1.    Consultative Examiner

     Plaintiff argues that the ALJ improperly accepted the opinion of the state agency

physicians over the opinion of the consultative examiner, Dr. Matzke.  The opinion of an

examining physician is entitled to greater weight than the opinion of a nonexamining physician.

*Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.

1984).  As is the case with the opinion of a treating physician, the Commissioner must provide

"clear and convincing" reasons for rejecting the uncontradicted opinion of an examining

physician.  *Pitzer*, 908 F.2d at 506.  Even if contradicted by another doctor, the opinion of an

examining doctor can be rejected only for specific and legitimate reasons that are supported by

substantial evidence in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

     Plaintiff asserts that the state agency opinion is inconsistent with the greater limitations

found by Dr. Matzke regarding Plaintiff's ability to carry out complex job instructions and his

ability to respond appropriately to work situations/requirements.  Plaintiff's Opening Brief, at p.

8-10.  The Commissioner contends that Dr. Matzke's opinion is not inconsistent with the state

agency opinion and supports the ALJ's assessment of Plaintiff's mental impairment.

     In this case, Dr. Matzke conducted two psychological evaluations of Plaintiff.  Dr.

Matzke first assessed Plaintiff in December 2002 and concluded that Plaintiff did not have "any

serious cognitive, emotional or behavioral dysfunction."  AR 283.  Dr. Matzke opined that

1   Plaintiff had a fair ability to understand, remember and carry out complex job instructions and a

2   fair ability to respond appropriately to work situations/requirements.  AR 285.  Plaintiff's ability

3   to function in these areas was markedly limited, but not precluded.  AR 284-85.  Dr. Matzke next

4   assessed Plaintiff on June 9, 2003.  AR 375-81.  Following completion of a mental status exam,

5   interview and testing, Dr. Matzke again opined that Plaintiff had no severe cognitive, emotional

6   or behavioral dysfunction and diagnosed Plaintiff with a Learning Disorder NOS by history.  AR

7   380.  Dr. Matzke further opined that Plaintiff had a fair (markedly limited, but not precluded)

8   ability to understand, remember and carry out complex job instructions and a fair ability

9   (markedly limited, but not precluded) to respond appropriately to work situations/requirements.

10  AR 381.

11      With regard to Plaintiff's functioning in these areas, state agency physician Dr. Luyen

12  Luu opined that Plaintiff was not significantly limited in understanding and memory, in sustained

13  concentration and persistence, in social interaction and in adaptation.  AR 295-96.  Dr. Luu also

14  opined that Plaintiff had sufficient ability to understand and remember simple and detailed

15  instructions and sufficient ability to carry out short and detailed instructions that did not involve

16  reading, math or writing.  AR 297.  Dr. Luu's opinion regarding Plaintiff's ability to carry out

17  complex job instructions and his ability to adapt do not appear inconsistent with Dr. Matzke's

18  assessment of a fair ability regarding complex job instructions and a fair ability to respond

19  appropriately to work situations.

20      In addition, the opinion of state agency physicians Keith Quint and Harvey Biala were

21  consistent with Dr. Matzke's assessment that Plaintiff's ability to function in these areas was

22  markedly limited but not precluded.  For example, Drs. Quint and Biala opined that Plaintiff had

23  moderate limitations in the ability to understand and remember detailed instructions and

24  moderate limitations in the ability to carry out detailed instructions, but he could understand and

25  remember adequately to perform simple routine and repetitive tasks (nothing complex), could

26  sustain concentration and persistence for 2-hour intervals, could adequately interact with public,

27  peers and supervisors in basic work situations and could adapt to normal work environment

28  situations at a simple, repetitive task level.  AR 390, 392.  Accordingly, Drs. Quint and Biala

accounted for Plaintiff's limitations regarding complex instructions and adaptability in a work

environment by limiting Plaintiff to simple, repetitive tasks.  Contrary to Plaintiff's assertion, the

ALJ's conclusion that Plaintiff's ability to understand, remember and carry out simple, repetitive

tasks has not been eroded by his psychological impairment is consistent with and supported by

both the opinions of state agency physicians and the opinion of Dr. Matzke.  AR 24.  The opinion

of state agency physicians can amount to substantial evidence, so long as they are supported by

other evidence in the record and are consistent with it.  *Andrews*, 53 F.3d at 1041.

2.      Teacher Questionnaire

Plaintiff also contends that the ALJ erred by failing to discuss a teacher questionnaire that

supports his mental limitations.  Plaintiff references the questionnaire completed by his teacher in

June 2003 in which she opined that Plaintiff had problems acquiring and using information.  AR

368.  The teacher further opined that he had serious problems comprehending oral instructions,

understanding school and content vocabulary, reading and comprehending written material,

comprehending and doing math problems, understanding and participating in class discussions,

providing organized oral explanations and adequate descriptions, expressing ideas in written

form, learning new material and applying problem-solving skills in class discussions.  AR 368.

He also had a very serious problem recalling and applying previously learned material.  AR 368.

Plaintiff's teacher reported that Plaintiff had problems attending and completing tasks.  AR 369.

He also had obvious problems, on a daily basis, with paying attention when spoken to directly,

sustaining attention during play/sports activities, focusing long enough to finish an assigned

activity or task, refocusing to task when necessary, carrying out multi-step instructions and

organizing his own things or school materials.  AR 369.

Lay witness testimony as to a claimant's symptoms is competent evidence which the

Commissioner must take into account.  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  The

ALJ may reject such testimony if he does so expressly, in which case "he must give reasons that

are germane to each witness."  *Id.*  The ALJ, however, "does not need to meet the impossible

burden of mentioning *every* piece of evidence" presented to him.  *Parks v. Sullivan*, 766 F.Supp.

627, 635 (N.D.Ill. 1991).  As long as substantial evidence supports the ALJ's conclusion and the

1   ALJ explains why "significant probative evidence has been rejected," an ALJ's failure to discuss

2   lay witness testimony constitutes harmless error. *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th

3   Cir. 1984). In *Vincent*, the court held that the omission of lay testimony in a hearing decision did

4   not require reversal because the medical evidence supported the ALJ's decision.

5        Here, any error by the ALJ in mentioning, but not discussing the third-party questionnaire

6   completed by Plaintiff's teacher was harmless for a number of reasons. First, as discussed above,

7   substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairment was not

8   disabling. The opinions of the consultative examiner and the state agency physicians supported

9   the ALJ's determination that Plaintiff did not have any severe cognitive limitations.

10       Second, Plaintiff and his mother both testified that he was able to graduate from high

11  school. AR 426, 447. Plaintiff also described his functioning level to include having a checking

12  account, paying some bills himself and taking a computer class. AR 430-431. Plaintiff's

13  assertion that he has a representative payee because he is not capable of handling his funds is

14  without merit. The record reflects that a payee was put into place while Plaintiff was receiving

15  benefits as a child. AR 47-50, 51-54, 59.

16       Third, the questionnaire was limited to Plaintiff's functioning in a classroom environment

17  and did not fully assess Plaintiff's functioning as an adult. And finally, the questionnaire

18  completed in June 2003 was contradicted by two other teacher questionnaires in the record. For

19  instance, in November 2002, Plaintiff's special day class teacher completed a Community

20  Outreach Questionnaire. AR 164-65. In that questionnaire, Plaintiff's teacher opined that

21  Plaintiff took good care of himself, did not exhibit any unusual behavior, mannerisms, fears or

22  posturing, did not need assistance keeping appointments, had no indications of memory loss or

23  problems with concentration or focusing, was cooperative, arrived on time, was accepted by his

24  peers and was able to understand and carry out simple verbal and written instructions. AR 164-

25  65. In May 2003, Plaintiff's teacher also completed a questionnaire. AR 359-66. Although the

26  teacher reported that Plaintiff had between 36-40 verified illness absences during the twelfth

27  grade, she did not report any significant functional difficulties. AR 359. Plaintiff's teacher

28  indicated that Plaintiff did not have any problems acquiring and using information, he only had

1  slight problems in comprehending oral instructions, understanding school and content

2  vocabulary, reading and comprehending written material, comprehending and doing math

3  problems, expressing ideas in written form, learning new material and recalling and applying

4  previously learned material.  AR 360.  Plaintiff's teacher further opined that Plaintiff had no

5  problem interacting and relating with others and had no problem moving about and manipulating

6  objects, and only had slight problems with taking care of his personal hygiene and using good

7  judgment regarding personal safety and dangerous circumstances.  AR 362-64.

8                                                    **CONCLUSION**

9         Based on the foregoing, the Court finds that the ALJ's decision is supported by

10  substantial evidence in the record as a whole and is based on proper legal standards.

11  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

12  Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in

13  favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff

14  Michael Hess.

15

16

17

18     IT IS SO ORDERED.

19  **Dated:**    **September 4, 2008**                    **/s/ Gary S. Austin**
                                                             UNITED STATES MAGISTRATE JUDGE
20

21

22

23

24

25

26

27

28